UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA)
)
      vs.          )      CASE NO.: 24-CR-80052--Rosenberg/Reinhart
)
)
TIMOTHY E. MARIS     )
)
     Defendant.    )
_____)

## MOTION FOR DOWNWARD DEPARTURE AND DOWNWARD VARIANCE FROM THE GUIDELINE RANGE AND INCORPORATED MEMORANDUM OF LAW

    The Defendant, Timothy E. Maris, through undersigned counsel, files this Motion for Downward Departure and Downward Variance from the Guideline Range and Incorporated Memorandum of Law and in support thereof, states:

### I.  INTRODUCTION

    The era of mechanized application of the sentencing guidelines to formulate an appropriate sentence is over.   The United States Supreme Court's decision in ***Pepper v. United States***, ___ U.S. ___ 131 S. Ct 1229 (2011) makes it abundantly clear that the era of individualized sentencing has returned and appears to be here to stay.    It has been the law for many years that the sentencing guideline range is not presumptively reasonable, is advisory only, and is but one and certainly not the most important factor the court must consider in fashioning a reasonable sentence.   ***Rita v. United States***, 127 S. Ct. 2456 (2007); ***Gall v. United States***, 128 S. Ct. 586 (2007).   In ***United States v. Hunt***, 459 F. 3d 1180 (11th Cir. 2006), the court held that there are "many instances" where the guideline range will not yield a reasonable sentence.   *Id*. at 1184.   The court held that District Courts are obligated to impose a reasonable sentence regardless of the guideline range, so long as the guideline has been considered. *Id*.

In the United States Supreme Court's most recent decision minimizing the impact of the guidelines on imposing a reasonable sentence, the court stated:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." ***Koon v. United States***, 518 U.S. 81 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." ***Williams***, 337 U.S. at 247, 69 S. Ct. 1079.

***Pepper supra.*** 1239-40. [Emphasis added].    The court went on to say:

> In particular, we have emphasized that "[h]ighly relevant if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id*. at 247, 69 S. Ct. 10-79. Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." ***Wasman v. United States***, 468 U.S. 559 (1984).

*Id*. at 1240.    While courts should give "respectful consideration" to the now advisory guidelines and their accompanying policy statements, the court in ***Pepper*** stressed that post-Booker decisions make clear that a district court may, in appropriate cases, impose a non-guideline sentence based on a disagreement with the Sentencing Commission's views.    ***Pepper, supra*.** at 1247.

## II.    FACTORS WARRANTING A DOWNWARD DEPARTURE AND/OR VARIANCE FROM THE PRESCRIBED GUIDELINE RANGE

Given the power returned to the District Court by the United States Supreme Court in its Post-*Booker* line of cases to grant variances by considering the 3553(a) factors, traditional departure analysis may be obsolete and no longer relevant.    See, ***United States v. Mohamed***, 459 F.3d 979, 986-87 ("We think the better view is to treat this scheme of downward and upward "departures" as essentially replaced by the requirement that judges impose a "reasonable"

sentence…. The concept of formal departures has become anachronistic….”); *United States v. Schroder*, 536 F.3d 746 (7th Cir. 2008) (“Although the concept of departures has been rendered obsolete in post-*Booker* sentencing… The District Court may apply those departure guidelines by way of analogy in analyzing the Section 3553 (a) factors.").   It is well settled that even if the district court denies the traditional downward departure based on certain mitigating factors, it may nevertheless consider those same factors to justify a downward variance under the 3553(a) analysis. *See e.g.*, *United States v. Carter*, 530 F.3d 565 (7th Cir. 2008); *United States v. Garcia*, 497 F.3d 964, 971 – 72 (9th Cir. 2007).

### A.    Sought Treatment Before Arrest

What makes this case particularly unusual is that, even before his arrest, Mr. Maris proactively sought treatment for his issues, including pornography addiction, depression and anxiety. Without any knowledge of a pending criminal investigation, Mr. Maris independently recognized the disturbing nature of his behavior and took the initiative to begin therapy with an online therapy program called BetterHelp. He demonstrated the foresight to acknowledge that his actions had become intolerable to him, prompting him to seek help for the underlying issues driving his irresponsible, impulsive, and sometimes unlawful conduct. This proactive step is significant because it demonstrates his genuine commitment to change and shows that he is particularly amenable to treatment.

### B.    Extraordinary Acceptance of Responsibility

Mr. Maris’ acceptance of responsibility in this case is so extraordinary that it should be viewed differently from cases in which defendants eventually plead guilty. Before the Government had even provided discovery, Mr. Maris instructed undersigned counsel to contact AUSA Gregory

Schiller to inform him of his intent to plead guilty and accept full responsibility for his actions. This early decision spared the Government from expending its limited resources on building a case against him.

Mr. Maris was fully advised of his rights, including the right to file motions on his behalf and to challenge the evidence. However, he immediately waived those rights, making it clear that there would be no litigation disputing the facts of his case. Mr. Maris was eager to admit his wrongdoing and accept whatever sentence the Court deems appropriate.

Additionally, his acceptance of responsibility statement, included in the PSI, demonstrates the profound depth of his acknowledgment of his wrongdoing. He conveys his extreme "regret and deep sorrow" for his actions, describing them as "illegal, immoral, and despicable." He reflects on how different things might have been if he had sought help sooner or reached out to family members for support.

He also expresses sincere remorse for the victims and their families and extends heartfelt apologies to his own family and friends. He hopes that, with their continued love and support, he will have the opportunity to make them proud again soon.

A defendant like Mr. Maris, who takes responsibility at the earliest possible stage, in the sincere and heartfelt way he did, should be treated differently than those who delay, challenge the Government's case, and only plead guilty after considerable time and resources have been expended. His prompt and unambiguous acceptance of guilt sets him apart and warrants special consideration.

### C.      Attempted Cooperation with The Government

In this case, the defendant submitted a proffer to the Government in an attempt to provide substantial assistance. In his proffer, Mr. Maris provided detailed information about individuals who may be involved in child pornography and others who have engaged in sexual conduct with children. Unfortunately, the Government determined that the information Mr. Maris provided did not meet the threshold for substantial assistance, and therefore, they did not file a §5K1.1 motion.

However, Mr. Maris should still receive some credit for his attempted cooperation, as it reflects his genuine effort to atone for his actions and turn his life around. His decision to cooperate also demonstrated a willingness to put himself and his family at potential risk, underscoring his commitment to assist the Government despite the dangers involved. This willingness to take personal risks to aid the Government deserves recognition.

Cooperation reduces the likelihood of recidivism and is beneficial part of defendant's history and character; therefore, below guideline sentence warranted under 18 U.S.C. Section 3553(a)(2)(C) even if government does not file 5K1.1 motion. *See*      Roberts v. United States, 445 U.S. 552, 558 (1980) (defendant's cooperation demonstrates that the "defendant will transgress no more [and will] respond to rehabilitative   efforts .[and] not deem himself at war with his society."); **U.S. v. Knox** *   2009 WL 2136871    (7th Cir. July 20, 2009) ("we agree with Davis that, as a general matter, a district court may consider a defendant's cooperation with the government as a basis for a reduced sentence, even if the government has not made a § 5K1.1 motion."); *United States v. Fernandez,* 443 F.3d 19, 33 (2d Cir. 2006) (reasoning that a district court should consider "the contention that a defendant made efforts to cooperate, even if those

efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1"); *United States v. Doe*, 398 F.3d 1254, 1260-61 (10th Cir. 2005) (concluding that "a defendant's assistance should be fully considered by a district court at sentencing even if that assistance is not presented to the court in the form of a § 5K1.1 motion"); U.S. v. Murray 2005 WL 1200185 (S.D.N.Y. May 20, 2005) (unpub.) (fact that D testified as witness for the government at time when he had nothing to gain "provides support for his genuine contrition"); U.S. v. Hubbard, 369 F.Supp.2d 146, 150 (D. Mass. 2005) (suggesting court can correct for government's bad faith not making motion under 3553(a)(2)(C); U.S. v. Khoury, 62 F.3d 1138 (9th Cir. 1995) (court may depart downward where government refuses to make §5K1.1 motion because D went to trial although gov. initially offered to do so and where D's cooperation led to arrest of co-D); U.S. v. Treleaven, 35 F.3d 458 (9th Cir. 1994); U.S. v. Paramo, 998 F.2d 1212 (3d Cir. 1993) (remanded to show whether government's refusal to make §5K1.1 motion for only coconspirator who went to trial was pretextual).    When departing downward, court must evaluate D's cooperation on an individualized basis and cannot engage in mechanical reduction of only 3-levels.   U.S. v. King, 53 F.3d 589, 590-92 (3d Cir. 1995).

### D.    Amenable to Treatment

On June 8, 2024, Mr. Maris was evaluated by Dr. Michael P. Brannon, Psy.D., a licensed psychologist in Florida since 1990 and co-director of the Institute for Behavioral Sciences and the Law (I.B.S.L.). Dr. Brannon has extensive experience in forensic psychology, having handled thousands of cases and testified as an expert over 1,500 times in both Federal and State Court

Criminal and Civil Divisions throughout Florida. He is frequently appointed as an expert by the judiciary and serves as a forensic consultant for defense attorneys and prosecutors.

Dr. Brannon conducted a thorough Sex Offender Risk Assessment of Mr. Maris. (See attached.) His evaluation placed Mr. Maris in the moderate risk range for sexual reoffending in the foreseeable future. Dr. Brannon's psychological testing also revealed symptoms of anxiety and depression in Mr. Maris. He opined that Mr. Maris would be a suitable candidate for weekly sexual offender rehabilitation groups, such as those offered by the REACH program at the Clinical and Forensic Institute in West Palm Beach, Florida. Dr. Brannon noted that "research has consistently revealed that individuals who complete sexual offender rehabilitation treatment have lower rates of sexual reoffending."

Furthermore, Dr. Brannon concluded that Mr. Maris did not exhibit any factors that would prevent him from benefiting from the recommended treatment services. Mr. Maris is aware of Dr. Brannon's findings and is eager to begin treatment as soon as possible. He is optimistic that with the recommended treatment, he will successfully address his issues and avoid future criminal behavior.

It cannot be overstated how deeply committed his friends and family are to supporting his recovery from addiction. They will stand by him every step of the way, and their unwavering love and support greatly enhance the likelihood of his treatment's success.

### E.   The Parsimony Provision of §3553.

Sentencing courts are obliged to consider all sentencing factors enumerated in 18 U.S.C. 3553(a).   The ultimate command of the statute is to impose a sentenced that is "sufficient, but not greater than necessary, to comply with the purposes set forth in subsection (a).   This is the so-called "parsimony provision."   *See, **United States v. Santoya***, 493 F. Supp. 2d 1075 (E.D. Wisc. 2007).   Timothy Maris, who is 27 years old, was born on November 21, 1996, in Palm Beach County, Florida. He is a lifelong resident of Palm Beach County, Florida. Mr. Maris has no prior contact with the criminal justice system.   He graduated from Wellington High School in Wellington, Florida on June 4, 2014, achieving a 3.03 grade point average and completing 196 community service hours.   In 2019, he obtained his bachelor's degree in marketing from Florida Atlantic University (FAU) in Boca Raton, Florida. At the time of his arrest, he was working towards completing pre-requisite courses to apply for the master's program in anesthesiology. Additionally, on November 12, 2019, Mr. Maris obtained his life, health and variable annuities license.

As evidenced by the numerous letters of support, Mr. Maris has significant positive attributes, and his character and background are demonstrated through his love and devotion to his family.

This court is permitted to consider the entirety of his background and character, not just the negatives reflected in his guidelines calculations.   *See, **Santoya**, id*. at 1081.

The guideline calculations have produced a sentence greater than necessary to satisfy the need for punishment, protection of the public and deterrence.

Courts have granted a downward variance for downward for first time offenders with no criminal record whatsoever even though they were in criminal history category I. *See, **United States v. Huckins***, 529 F.3d 1312 (10th Cir. 2008).

Moreover, many courts have recognized that any jail sentence (even a short sentence) has a much worse significant effect on a first offender other than on someone who has prior convictions or prior contact with law enforcement.   ***United States v. Baker***, 445 F.3d 987 (7th Cir. 2006) ("significant is the district court's finding that a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned.")

A first-time offender sentenced to any prison time is much less likely to recidivate than all other offenders.   ***United States v. Cabrera***, 567 F. Supp. 2d 271, 279 (D. Mass 2008) (the court cited the Sentencing Commission's Report, Recidivism in the First Offender, suggesting that individuals with 0 criminal history points are less likely to recidivate than all other offenders).

## III. CONCLUSION

It is respectfully submitted that Mr. Maris should be the beneficiary of a downward departure or variance. Nothing will change the fact that Mr. Maris is now a convicted felon and a sexual offender and will be one for the rest of his life.   Mr. Maris will have to live with these impediments and hopefully continue to be a productive member of society besides the stigma associated with having a serious criminal record and a sex offender label.   Mr. Maris has fully accepted responsibility for his criminal actions and attempted to cooperate with the government. Mr. Maris deeply regrets his behavior and is extremely embarrassed and remorseful.

**WHEREFORE**, based upon the above and foregoing, the Defendant respectfully requests this Court to grant the instant motion.

LAW OFFICES OF MARK EIGLARSH

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via CM/ECF to: United States Attorney's Office, AUSA Gregory Schiller, 500 South Australian Avenue, Suite #400 West Palm Beach, FL 33401 and the Clerk of Court, 701 Clematis Street Room #202 West Palm Beach, FL 33401 this 20th day of September, 2024.

Respectfully submitted,

**LAW OFFICES OF MARK EIGLARSH**
**3107 Stirling Road**
**Suite 207**
**Fort Lauderdale, Florida 33312**
**Telephone (954) 500-0003**
**Facsimile (305) 674-0102**
**Mark@EiglarshLaw.com**

BY: __/s/ *Mark Eiglarsh*_____
　　　MARK EIGLARSH
　　　Florida Bar No.: 956414



**Office:** (954) 766-8826
**Fax:** (954) 764-3486

11760 W. Sample Road, #103
Coral Springs, Florida 33065

## Confidential Forensic Psychological Evaluation
### (Sex Offender Risk Assessment)

| | |
|---|---|
| **Examinee's Name:** | Timothy Maris |
| **Case #:** | 24-80052 – Rosenberg/Reinhart |
| **Date of Evaluation:** | 06-08-24 |
| **Date of Report:** | 06-11-24 |
| **Judge:** | Robin L. Rosenberg |
| **Defense Attorney:** | Mark Eiglarsh, Esquire |
| **Examiner:** | Michael P. Brannon, Psy.D. |

**Referral Information:** The examinee was evaluated at the request of his attorney, Mr. Mark Eiglarsh, for a sexual offender risk assessment with risk reduction strategies if clinically indicated. The examinee reported that he is charged with six counts of Distribution of Obscene Visual Representation of the Sexual Abuse of Children. He has been incarcerated since 04-08-24. He was evaluated on the above date at the Main Detention Center in Palm Beach County, Florida.

**Sources of Information:**

> Clinical Interview
> Mental Status Examination
> STATIC-99R
> STABLE-2007
> Minnesota Multiphasic Personality Inventory – Third Edition (MMPI-3)
> Beck Anxiety Inventory  (BAI)
> Beck Hopelessness Scale (BHS)
> Beck Depression Inventory – Second Edition (BDI-II)
> Reliable Digit Span
> Indictment
> Criminal Complaint
> Penalty Sheet
> Jail Medical Records
> Telephone Interview with Ms. Elena Maris (examinee's mother)

**Notification of Confidentiality Limitations:** The examinee was informed of the purpose of the current assessment and the limitations of its confidentiality, and he agreed to participate in the evaluation. He was encouraged to be honest in his responses to examiner inquiries and during psychological testing.

**Relevant Historical Information:** Mr. Maris reported that he is 27 years of age and that he was born in Wellington, Florida 11-21-96. He stated that his mother and father raised him with two older brothers. He did not report any incidents of abuse, neglect, or domestic violence during his formative years. He described his parents as "very strict." He did not report exposure to any traumatic events during his childhood or adolescence. He described his childhood as "happy." He was not aware of any family history of mental illness or drug/alcohol abuse.

Academically, the examinee reported that he completed high school and four years of college, earning a Bachelor's degree in Marketing. He stated that he earned above-average to average grades in mainstream classes. He related that he was never retained at a grade level. He did not report behavioral problems in school. He did not report any problems in school due to inattentiveness or hyperactivity. He related that he was a member of his high school swim team. He stated that he had several friends in high school. He reported that he was excessively teased by his peers while in school.

The examinee reported he has never been married. He related that his longest romantic relationship lasted for two years. He stated that he cohabitated in his last relationship for "about a year." He did not report any incidents of domestic violence during any of his romantic relationships. He stated that he does not have any children. He reported he was residing with his girlfriend in Wellington, Florida at the time of this assessment. He stated that he has never been homeless.

Occupationally, the examinee reported that he was employed full-time at his parent's construction company at the time of his arrest. He reported that his longest job was for four years at his parent's business. He reported that he was never fired from a job. He stated that he has never received Social Security disability or unemployment benefits. He related that he has never served in the military.

Legally, the examinee reported that he was never arrested before his current legal charges. He related that he was never a member of a delinquent youth gang, militia group, or cult, and he has never associated with known members of those groups.

Socially, the examinee reported that he has numerous friends in the community. He indicated that none of his friends have experienced legal problems and none of his friends have abused drugs or alcohol. Recreationally, the examinee reported that he enjoys playing soccer.

Regarding his mental health history, the examinee reported that he participated in several sessions of individual counseling by telephone immediately before his arrest on the current charges. He stated that he felt "trapped" at that time due to "secrets" he was keeping from his girlfriend and mother. He did not report any other form of psychiatric or psychological treatment services. He reported that he has never attempted suicide, entertained ideations of self-harm, or purposefully cut or burned himself. He did not report symptoms of mania. He revealed symptoms of depression and anxiety beginning before he was arrested and worsening in severity since his arrest and incarceration. He stated that he has suffered several panic attacks. He did not report auditory or visual hallucinations. He did not report any "special powers" or other possible delusional beliefs. He did not report anger control problems. He did not report exposure to any traumatic incidents. He did not report symptoms of an eating disorder.

The examinee reported that he has used marijuana and alcohol. He related that he has never used other illicit substances or abused prescription medications. He stated that he initially used alcohol and marijuana when he was "19 or 20." He reported that he used alcohol daily for one month in 2024. He related that he has used cannabis approximately three times. He reported that he has used drugs and alcohol when he was alone and while he was in the company of others. He stated

that he suffered two blackouts due to his abuse of alcohol. He reported that he has never experienced withdrawal symptoms. He identified his mother as his primary source of support in the community. He stated that he has never participated in substance rehabilitation treatment or attended a recovery group meeting. He reported that he has never engaged in problematic gambling behaviors.

Medical health was reported as unremarkable as he did not reveal any major injuries or illnesses. He stated that he has never suffered a head injury.

**Mental Status Examination:** The examinee was appropriately groomed and attired in a blue jail uniform. He reported his height as 5'10" tall and weight as 175 pounds. His general clinical presentation was cooperative and his demeanor was serious. He was able to state his name, date, and location. Activity levels were within normal limits with no apparent impairments. Eye contact was direct and unremarkable. His attention span was within normal limits as he was not easily distracted by extraneous stimuli. Memory functions were intact on brief measures of those cognitive skills. Responses to examiner inquiries were appropriate in volume, pacing, and word production. He did not display any behaviors that were suggestive of the presence of imaginary internal stimuli (hallucinations). He did not verbalize any statements that were consistent with an active delusional belief system. Functional intelligence was grossly estimated in the High Average range based on his reported educational attainment, use of vocabulary, and general fund of knowledge. He expressed his emotions in a full range and his mood appeared depressed. He was not suggestible at any time. Judgment, problem-solving skills, and insight were good. He did not report suicidal or homicidal ideations or plans.

**Collateral Interview:** In a telephone interview with the examinee's mother, Ms. Elena Maris, she reported that her son was not exposed to any trauma, abuse, or domestic violence during his childhood or adolescence. She reported that he was identified as having a "borderline learning disability" when he was in the second grade. She stated that her son completed high school in mainstream classes and subsequently earned a Bachelor's degree in Business/Marketing. She related that he has been employed full-time in the family business and described him as a "very diligent worker." She stated that her son has one friend in the community whom he has associated with since childhood. She related that he has been involved in romantic relationships with same-aged females. She reported that her son was currently involved in a long-term romantic relationship with a same-aged female, and he cohabitated with that partner for 1½ years. She stated that her son does not have anger control problems and she has never observed him engage in acts of aggression toward others. She related that her son does not have problems following established rules and regulations. She was not aware of any drug or alcohol abuse by her son. She stated that her son has never been diagnosed with a mental health condition, although she recently became aware that he participated in counseling services (Better Help) before his arrest. She reported that he advised her that he participated in four sessions of online counseling due to "realizing that he was spiraling out of control and couldn't stand what he had become." She was not aware of her son engaging in any other form of mental health treatment. Medically, she related that her son suffers from dermatological problems. She was aware of the current allegations against her son and stated that she was "absolutely shocked" by those charges. She stated that she has never observed any behavior or heard any comments by her son that would suggest that he was sexually attracted to juveniles. She was not aware of any

complaints against her son involving inappropriate sexual behaviors or statements. She reported that her son has several family members who would support him throughout his current legal situation.

**Collateral Mental Health Document:** Jail medical records revealed that the examinee was incarcerated on the current allegations on 04-08-24. He has been housed in the general population housing unit since that date. The examinee has not been diagnosed with a mental health condition or prescribed psychotropic medication. On 06-06-24, it was reported, "Pt. seen per request of detective Dimola after hearing pt. state 'I want to die' on phone transcripts on 6/1. Pt. denies suicidal ideation, plan, or intent upon current assessment." The examinee was reported to have endorsed depression related to his current legal case. He was noted to have declined psychotropic medication on that date, although he indicated that he would consider future use.

**Psychological Testing:** The Minnesota Multiphasic Personality Inventory – Third Edition (MMPI-3) is a frequently administered personality test in clinical and forensic settings. It has several Validity scales designed to assess for response distortion and numerous Clinical scales designed to assess for symptoms of a mental health disorder. Validity scales did not reveal any significant elevations. As a result, Clinical scales were determined to be valid and interpretable. Clinical scales did not reveal any significant elevation. In other words, the MMPI-3 was within normal limits in all areas measured by this test instrument.

The Beck Hopelessness Scale (BHS) is a frequently administered test designed to assess feelings of hopelessness. The examinee obtained a Total Score on the BHS that falls in the Low range. Individuals who obtain the same score as the examinee report few symptoms of hopelessness during the seven days before the test date.

The Beck Anxiety Inventory (BAI) is one of the most commonly administered screening tools for anxiety. The examinee obtained a Total Score on the BAI that falls in the Moderate range for anxiety. Individuals who obtain the same score as the examinee report several symptoms of anxiety during the 30 days before the test date.

The Beck Depression Inventory – Second Edition (BDI-II) is one of the most commonly used brief assessment scales for symptoms of depression. The examinee obtained a total score on the BDI-II that falls in the Severe range of depressive symptomatology. Individuals who obtain the same score as the examinee report numerous symptoms of depression during the two weeks before the test date.

Reliable Digit Span is an effort test requiring the examinee to repeat several digits forward and backward. Individuals who score below the cut-off score are often suspected of poor effort on cognitive tasks. The examinee scored above the established cut-off score on this test. As a result, the examinee's score was consistent with adequate effort on cognitive tasks.

**Current Allegations:** The Probable Cause Affidavit stated that the examinee was charged with six counts of Distribution of Obscene Visual Representation of the Sexual Abuse of Children for a series of incidents that allegedly occurred between 09-21-23 and 03-18-24. It was reported that the examinee repeatedly engaged in telephonic contact with an undercover (UC) agent via the

Kik social media application to engage in sexual activities with a "female child." Moreover, the examinee sent numerous cartoon/computer-generated images that depicted child sexual abuse to the UC agent. The examinee detailed wanting to engage in various sexual activities with the "child," including kissing, mouth-to-penis oral sex, mouth-to-vagina oral sex, unprotected sexual intercourse, and ejaculating. Notably, the examinee discussed facilitating an in-person meeting to engage in the above-referenced activities with the child in several instances and met with the UC in person on one occasion on 12-07-23. Based on the above, probable cause existed to charge the examinee with the listed offenses.

**Psychosexual History:** The examinee reported that he was involved in sex education classes when he was in middle school. He stated that he never spoke to either of his parents about sex. He reported that he frequently spoke to his male friends about sex during his teenage years. He reported that he initially masturbated when he was 12 years of age. He did not reveal any problematic patterns regarding masturbation such as excessiveness or inappropriate locations. He reported that his first sexual contact with another person that did not include intercourse occurred when he was 14 years of age. He disclosed that his initial sexual contact which included intercourse happened when he was 18 years of age. He stated that he has been involved in sexual activities with 15 individuals in his life. He reported that he never participated in multiple-partner sex. He identified his sexual orientation as exclusively heterosexual. He reported that he never forced or coerced another individual into sexual activities. He reported that he never used drugs or alcohol to facilitate sexual activities with a person who initially refused to engage in sex. He revealed that he has visited "strip clubs" on several occasions. He stated that he never exposed his genitalia to a non-consenting adult for sexual arousal (exhibitionism). He indicated that he never viewed a non-consenting adult engaged in sexual activities or undressing for sexual arousal (voyeurism). He reported that he has engaged in consensual sexual activities involving physical pain and humiliation of another person (sadomasochism). He reported that he has never used the services of an escort or prostitute. He stated that he has never purposefully touched the genitals of another person and pretended that it was accidental (frotteurism). He reported that he has never participated in a paid massage that included sexual activities. He reported that he has never engaged in any sexual activities involving animals of another species (bestiality). He did not report any sexual activities involving feces or urine (coprophilia, urolagnia). He reported that he has been involved in consensual sexual activities that involved choking (erotic asphyxiation) of another person.

The examinee reported that he initially viewed online adult pornography when he was 14 years of age. He reported that he has masturbated to adult pornography online on numerous occasions. He reported that his preferred categories of adult pornography were "Asian," "Stepdaughter," and "Blonde." He expressed his belief that he was addicted to adult pornography and he was watching those videos "about five times per week" for approximately four years. He stated that he eventually became "tired of what I was watching," leading to his viewing of child pornography. He reported that he has never accessed a paid webcam sex room. He stated that he has sent and received naked images by cellular telephone on numerous occasions with consenting adult females. He reported that he has engaged in sexual conversations with juveniles on several occasions. He reported that he has spoken to other adults online regarding sexual activities with juveniles. He reported that he has never been employed in a job or volunteered for an activity that involved frequent contact with juveniles. He reported that he has experienced

sexual attraction for prepubescent children. He reported that he has masturbated to images or fantasies of prepubescent children. He reported that he was involved in sexual activities with a juvenile on one occasion when he was 22 years of age. He stated that he has never taken a video or picture of a juvenile in the community for sexual purposes. He reported that there have never been any prior complaints regarding his sexual behavior or statements. He reported that he belonged to online groups that endorsed sexual behaviors between adults and juveniles. He reported that he has never experienced any sexual performance problems such as premature ejaculation, erectile difficulties, or loss of sexual desire.

**Actuarial Assessment:** The STATIC-99R is an actuarial instrument developed for assessing the potential risk of future sexual offending behavior for an identified offender. *The following actuarial analysis is only valid if the current allegations are accurate as charged.* The examinee's STATIC-99R scores were as follows:

| | |
|---|---|
| Prior Sex Offenses | 0 |
| Prior Sentencing Dates (4 or more) | 0 |
| Convictions for Non-Contact Sex Offenses | 0 |
| Index Non-Sexual Violence | 0 |
| Prior Non-Sexual Violence | 0 |
| Any Unrelated Victims | 1 |
| Any Stranger Victims | 1 |
| Any Male Victims | 0 |
| Age | 1 |
| Ever Lived with Lover for at Least Two Years | 1 |

The STABLE 2007 is an actuarial instrument developed for assessing dynamic (subject to change) factors associated with future sex-offending behavior for an identified offender. *The following actuarial analysis is only valid if the current allegations are accurate as charged.* The examinee's STABLE 2007 scores were as follows:

| | |
|---|---|
| Significant Social Influences | 1 |
| Capacity for Relationship Stability | 0 |
| Emotional Identification with Children | 0 |
| Hostility Towards Women | 0 |
| General Social Rejection/Loneliness | 0 |
| Lack of Concern for Others | 0 |
| Impulsive Acts | 2 |
| Poor Cognitive Problem-Solving | 0 |
| Negative Emotionality/Hostility | 0 |
| Sex Drive/Preoccupation | 2 |
| Sex as Coping | 1 |
| Deviant Sexual Interests | 2 |
| Cooperation with Supervision | 0 |

**Conclusions:** The examinee's score on the STATIC-99R was a 4. Individuals in the standardization sample who obtained the same score as the examinee sexually reoffended at a rate of 9.2% over 5 years and 13.9% over 10 years. The examinee's score of 8 on the STABLE 2007 places him in the Moderate risk range for sexual reoffending in the foreseeable future. In an abundance of caution, and as recommended as best practice standards by the Association for the Prevention and Treatment of Sexual Abuse (ATSA), the examinee should be considered for a sex offender polygraph to assess for possible undetected sexual contact offenses. Psychological testing revealed symptoms of anxiety and depression. Validity testing did not reveal indications of defensiveness, malingering, or poor effort. In a telephone interview with the examinee's mother, she reported that she never observed any behavior by her son or heard him verbalize any statements that would suggest he was sexually attracted to juveniles. Based on the information available for this report, the examinee would be an appropriate candidate for participation in weekly sexual offender rehabilitation groups at a program such as REACH at the Clinical and Forensic Institute in West Palm Beach, Florida. Research has consistently revealed that individuals who complete sexual offender rehabilitation treatment have lower rates of sexual reoffending. The examinee did not display any factors that would prevent him from benefitting from treatment services as outlined above.

Thank you for the opportunity to participate in this interesting case and please feel free to telephone me if you require further information in this matter.

**Michael P. Brannon, Psy.D.**
Licensed Psychologist
PY4289